UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| ENVTECH, INC., | Case No. 3:21-cv-00048-MMD-CLB |
| Plaintiff, | ORDER |
| v. | |
| RICHARD VICTOR RUTHERFORD, | |
| Defendant. | |

## I.    SUMMARY

Plaintiff EnvTech, Inc. brings this action against former employee Richard Victor Rutherford. The parties dispute whether Rutherford breached non-disclosure and non-compete agreements and misappropriated trade secrets by disclosing to a subsequent employer EnvTech's proprietary chemical formula and cleaning process for petroleum refineries. (ECF No. 1-2 ("Complaint").) Before the Court are the parties' cross-motions for summary judgment (ECF Nos. 71, 72 ("Motions")) and accompanying motions to seal (ECF Nos. 70, 73, 87, 90). For the following reasons, the Court will deny EnvTech's Motion, grant Rutherford's Motion in part, grant EnvTech's motions to seal, and grant in part Rutherford's motions to seal.

## II.    BACKGROUND

The following facts are undisputed.[1]

EnvTech provides chemical cleaning services for oil and gas refineries. (ECF No. 71 at 6.) One of their specialties is performing two-step neutral pH chelant HF alkylation unit cleanings—rather than using the three-step process employed by most other chemical cleaning companies. (Id. at 6-7; ECF No. 99 at 3.) EnvTech can perform these

---

[1]Rutherford challenged the admissibility of several exhibits upon which the Court relies in deciding the Motions. (ECF Nos. 86 at 4-5; 102 at 4-5.) The Court addresses and denies these challenges later in this order. See infra Part III.C.

cleanings in two steps because of their proprietary process and formulas for ETI 995, a cleaning and gas-freeing buffer; ETI 929, a water-based circulation surfactant; and ETI 987, an HF scale remover. (ECF No. 71 at 7.) EnvTech guards these formulas by limiting who learns them, requiring all employees to sign non-disclosure agreements, and ensuring that the formulas are not kept in writing. (*Id.* at 7-8, 29.) EnvTech also installed password protection on company emails and laptops, and often marks documents as proprietary. (*Id.*; ECF Nos. 70-3 at 308-23 (sealed); 99 at 4-5.) For many years, EnvTech was one of the only, if not the only, commercial cleaning companies that offered pH neutral chelant cleanings for HF alkylation units, and they controlled 80-90% of the global market for pH neutral chelant cleaning of HF alkylation units. (ECF Nos. 71 at 6; 92-2 at 4; 99 at 22-23; 99-25 at 10-11.) HF alkylation units are cleaned every four to six years. (ECF No. 71 at 8.)

Before his employment with EnvTech, Richard Rutherford spent 27 years working for Conoco Petroleum on their hydrofluoric acid ("HF") alkylation units, planning operations and mechanical work for refinery unit chemical cleaning procedures. (ECF No. 72 at 4.) As a Conoco employee, Rutherford assisted EnvTech with performing two neutral cleanings of Conoco's HF alkylation units in 2001 and 2005. (ECF Nos. 71 at 8; 72 at 4.) Rutherford also flew to the United Kingdom to observe EnvTech clean the Humber Refinery HF alkylation unit. (ECF No. 88 at 33 (sealed).)

Rutherford first began working for EnvTech as an independent contractor, then was hired as a full-time employee in December 2010. (ECF Nos. 1-2 at 3; 71 at 9; 72 at 4; 99-5.) Before commencing his full-time employment with EnvTech, Rutherford signed the Employee Trade Secrets and Non-Competition Agreement ("TNSCA") and the Employment Agreement (collectively, "the Agreements") on December 14, 2010. (ECF Nos. 71 at 9-10; 72 at 4; 72-4; 72-5.) It is unclear which contract was executed first, but both Agreements contained non-competition, non-disclosure, and severability clauses. (ECF Nos. 72 at 4; 72-4; 72-5.)

While an employee at EnvTech, Rutherford executed refinery cleanings, met with

2

EnvTech clients and prospective customers, prepared pricing and service proposals, and operated EnvTech's blending facility in Ponca City, Oklahoma. (ECF Nos. 71 at 12; 72 at 5; 71-3 at 6.) Rutherford's full-time employment with EnvTech ended in 2017, although he continued to work with EnvTech as a contractor until August 2019 and thus retained possession of his password-protected company laptop. (ECF Nos. 71 at 8, 13; 72 at 5; 99 at 9.)

During this time, Paul Taylor—a former owner of EnvTech who had gone on to work with USA Debusk ("USAD")—began recruiting Rutherford to USAD. (ECF Nos. 70-3 at 68 (sealed); 71 at 14; 99 at 10-11.) USAD then hired Rutherford in January 2020. (ECF Nos. 72 at 6; 86 at 9.) Two refineries—PBF Energy Torrance Refinery ("PBF") and Flint Hills Resources ("FHR")—contacted USAD about performing chemical cleanings of their HF alkylation units, at least in part due to scheduling issues with EnvTech. (ECF Nos. 74-1 at 3; 74-2 at 3; 74-3 at 3; 86 at 10; 99-20 at 2-4; 99-25 at 4-5.) Rutherford emailed Taylor EnvTech information and numerous EnvTech documents to assist with bidding on and executing these jobs. (ECF Nos. 70-3 at 93-135, 157-206, 307-43 (sealed); 71 at 19-22; 86 at 9-10.) This included EnvTech's proposals, quotations, material safety data sheets, descriptions of the environmental effects of their HF alkylation unit cleaning solutions, refinery flow path diagrams, HF alkylation unit cleaning procedures, and an EnvTech computer program's estimated quantities and costs of cleaning solutions for PBF. (ECF Nos. 70-3 at 93-135, 157-206, 307-43; 86 at 9-10.) While some of these documents are owned by the refineries, many were produced by EnvTech and Rutherford retrieved the information and documents from his EnvTech-issued laptop. (ECF No. 71 at 19; 71-4 at 24-25, 40-42; 21; 72 at 9-11.) EnvTech did not authorize Rutherford to share the documents or information. (ECF Nos. 71 at 19; 71-4 at 26.) In preparation for USAD's work at FHR, Rutherford also held an "HF alky training orientation" for USAD project managers and engineers in June 2020. (ECF Nos. 71 at 22; 71-19 at 2, 4-5.)

EnvTech filed a complaint against Rutherford, alleging five causes of action: (1)

3

breach of contract, (2) breach of implied covenant of good faith and fair dealing, (3) intentional interference with a prospective economic benefit, (4) intentional interference with contractual relations, and (5) misappropriation of trade secrets. (ECF No. 1-2.) The Court dismissed EnvTech's second, third, and fourth causes of action. (ECF Nos. 1, 33.) The parties now seek summary judgment on the breach of contract and misappropriation of trade secrets claims. (ECF Nos. 71, 72.)

## III.    MOTIONS FOR SUMMARY JUDGMENT

Both Motions address EnvTech's breach of contract and misappropriation of trade secrets claims, and their corresponding responses and replies also raise questions about the admissibility of almost two dozen exhibits. (ECF Nos. 71, 72, 86, 102, 104). For the reasons discussed below, Rutherford is entitled to partial summary judgment, and the Court grants his Motion in part; however, EnvTech's Motion is denied due to numerous remaining issues of fact.

### A. Breach of Contract Claim

To succeed on a breach of contract claim under Nevada law, a plaintiff must establish four elements: "(1) formation of a valid contract; (2) performance or excuse of performance by the plaintiff; (3) material breach by the defendant; and (4) damages." *Padilla Constr. Co. of Nev. v. Big-D Constr. Corp.*, No. 67397, No. 68683, 2016 WL 6837851, *1 (Nev. Nov. 18, 2016) (citing *Laguerre v. Nev. Sys. of Higher Educ.*, 837 F. Supp. 2d 1176, 1180 (D. Nev. 2011)); *see also Richardson v. Jones*, 1 Nev. 405, 405 (Nev. 1865). Rutherford disputes the validity of the Agreements' non-competition clauses, whether he materially breached the Agreements' terms, and whether any breach harmed EnvTech. (ECF No. 72 at 9-17.)

### 1.    Validity of Employment Agreement and TSNCA

Rutherford solely challenges the Agreements' non-competition clauses as being ambiguous and unreasonable under Nevada law. (ECF No. 72 at 10-13.) The Court will address these arguments in turn and presumes the other clauses of the Agreements are valid, as they are supported by consideration. (ECF No. 71 at 24-25.) *Cain v. Price*,

4

1    415 P.3d 25, 28 (Nev. 2018).

2    ### a.    Ambiguity of Contracts

3    Rutherford argues that, because each agreement states that it supersedes all

4    others and it is unclear which was signed first, any inconsistencies between the

5    Employment Agreement and the TSNCA should be construed against EnvTech. (ECF

6    No. 72 at 10.) But there are no material inconsistencies between the scope of the two

7    five-year-long post-employment non-competition clauses.[2] The Employment Agreement

8    prohibits Rutherford from providing any service to EnvTech clients, whereas the TSNCA

9    prohibits Rutherford from engaging in any competitive activity relating to his

10   employment with EnvTech. (ECF Nos. 72-4 at 5; 72-5 at 6.) These terms are not

11   inconsistent but merely cover different activities. The Agreements should be enforced in

12   conjunction with each other, and if they are valid, Rutherford is subject to both of their

13   terms.

14   ### b.    The TSNCA's Non-Competition Clause

15   Under Nevada law, a non-competition agreement is unreasonable if it imposes a

16   restraint on trade that is "greater than is required for the protection of the person for

17   whose benefit the restraint is imposed or imposes undue hardship upon the person

18   restricted." *Golden Rd. Motor Inn, Inc. v. Islam*, 376 P.3d 151, 155 (Nev. 2016) (quoting

19   *Hansen v. Edwards*, 426 P.2d 792, 793 (Nev. 1967)) (cleaned up). Nevada courts

20   evaluate post-employment non-competition agreements "with a higher degree of

21   scrutiny than other kinds of noncompete agreements because of the seriousness of

22   restricting an individual's ability to earn an income." *Shores v. Glob. Experience*

23   *Specialists, Inc.*, 422 P.3d 1238, 1241 (Nev. 2018). "The amount of time the covenant

24

---

25   [2]Rutherford is incorrect in stating that the TSNCA does not apply post-
     employment. In a section misleadingly titled "Competitive Activities During
26   Employment," the TSNCA prohibits Rutherford from engaging in competitive activity
     relating to his employment with EnvTech for "the term of this Agreement." (ECF No. 72-
27   4 at 5.) The TSNCA's term is defined in the immediately succeeding paragraph as "so
     long as [Rutherford] performs services for [EnvTech], *and for five (5) years after the*
28   *date that [Rutherford] last performed services for [EnvTech]*." (*Id.* (emphasis added).)

lasts, the territory it covers, and the hardship imposed upon the person restricted are factors for the court to consider in determining whether such a covenant is reasonable." *Jones v. Deeter*, 913 P.2d 1272, 1275 (Nev. 1996).

The TSNCA's five-year post-employment non-competition clause is unreasonably long. Even if a five-year prohibition is needed to protect EnvTech's interests because HF alkylation units are cleaned every four to six years, the non-compete is still unenforceable if it imposes "undue hardship" on Rutherford. (ECF Nos. 96 at 24; 104 at 17.) *See also Camco, Inc. v. Baker*, 936 P.2d 829, 833 (Nev. 1997). The Nevada Supreme Court has never upheld a post-employment non-competition agreement that lasted longer than two years. *See Jones*, 913 P.2d at 1275 (invalidating a five-year post-employment non-compete); *cf. Ellis v. McDaniel*, 596 P.2d 222, 223-24 (Nev. 1979) (upholding a two-year post-employment non-compete). The Court is thus comfortable predicting that the Nevada Supreme Court would find "a five-year duration . . . places too great a hardship on" Rutherford and the non-competition clause is unreasonable as a result. *Jones*, 913 P.2d at 1275; *see also Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011).

As for the effects of this invalidity, the Court adopts Judge Boulware's reasoning in *Paws Up Ranch, LLC v. Martin* and finds that NRS § 613.195(6) does not apply retroactively to contracts executed before its enactment.[3] *See* 463 F.Supp.3d 1160, 1167-69 (D. Nev. 2020). Accordingly, an unreasonable provision renders a non-competition agreement wholly unenforceable, unless it contains a 'blue-pencil' provision allowing the reviewing court to modify it. *See Golden Rd.*, 376 P.3d at 156; *Duong v. Fielden Hanson Isaacs Miyada Robison Yeh, Ltd.*, 478 P.3d 380, 381 (Nev. 2020).

Rutherford signed the TSNCA in 2010, long before the enactment of NRS § 613.195 in 2017. (ECF Nos. 71 at 9; 72 at 4.) The TSNCA does not contain a blue-pencil provision, so the entirety of its non-competition clause is unenforceable. (ECF

---

[3]Because NRS § 613.195 does not apply retroactively, the Court similarly rejects Rutherford's arguments that § 613.195(5) invalidates the non-competition clauses.

No. 72-4.) Rutherford's Motion is thus granted as to his liability for breaching the non-competition clause of the TNSCA. However, the invalid non-competition clause is excised from the rest of the contract, and the TSNCA's remaining provisions are left intact. (*Id.* at 5 (TSNCA severability clause).)

### c.   The Employment Agreement's Non-Competition Clause

The Employment Agreement, on the other hand, states that any unreasonable provisions of its restrictive covenants are divisible as to time and geographic area, separable into 12-month periods and 50-mile radii. (ECF No. 72-5 at 6.) This blue-pencil provision says nothing about the scope of work covered, rendering the entirety of the non-competition clause invalid if the scope of activity covered is over-broad.

The Employment Agreement prohibits Rutherford from "provid[ing] any service to or lend[ing] any aid or device to any of the clients of" EnvTech. (ECF No. 72-5 at 6.) The plain language of this non-competition clause would prevent Rutherford from working for EnvTech's client refineries in any capacity—even in roles which in no way implicate the services EnvTech offers. *See Golden Rd.*, 376 P.3d at 155; *Ellis*, 596 P.2d at 224-25 (holding that a prohibition on performing services that a former employer did not offer was unreasonable). Not only is Rutherford unlikely to lure contracts away from EnvTech if he is not assisting with refinery equipment cleaning, but he also may be severely burdened if he is excluded from working with EnvTech clients. (ECF No. 71-2 at 3 (claiming that EnvTech previously controlled 80-90% of the global market for pH neutral chelant cleaning of HF alkylation units).) *See also Golden Rd.*, 376 P.3d at 155-56. But without a full customer list from EnvTech and more information on Rutherford's experience performing other types of refinery cleanings, it is difficult to calculate how greatly the non-compete burdens Rutherford's ability to be gainfully employed, and issues of material fact remain. Regardless of whether its scope of activities is overbroad, the severability clause of the Employment Agreement leaves its other provisions, like the non-disclosure clause, intact. (ECF No. 72-5 at 8.)

In case the non-compete's scope of activities is reasonable, the Court will assess

the reasonableness of its geographic scope and duration. Limiting the interpretation of 'clients' under the non-competition clause to encompass just the individual refineries with which EnvTech has worked, rather than their parent companies, ensures that Rutherford is prohibited from working only in locations where EnvTech has "established customer contacts and good will." *Shores*, 422 P.3d at 1241 (quoting *Camco*, 936 P.2d at 834). With this constraint, the geographic breadth of the non-compete is reasonable.

However, the five-year post-employment non-compete is unreasonably long. *See Jones*, 913 P.2d at 1275. Balancing the burden on Rutherford and the longevity of the trade secret EnvTech seeks to protect, the Court limits the non-competition clause's duration to two years post-employment, assuming the clause is not otherwise invalid. *See Ellis*, 596 P.2d at 223-24.

### 2.   Breach of Valid Contractual Obligations

#### a.  Non-Competition Clause of the Employment Agreement

The Employment Agreement states that Rutherford may not provide any service or aid to EnvTech clients for a term beginning on the last date that Rutherford "performed services for" EnvTech. (ECF No. 72-5 at 5-6.) Rutherford's full-time employment with EnvTech ended in 2017, though he continued to work with EnvTech as a contractor until August 2019. (ECF Nos. 71 at 13; 72 at 5.) Given the unfairness of extending the non-competition clause and the parties' agreement that EnvTech stopped employing Rutherford in 2017, the Court finds that the post-employment non-compete began to run at the conclusion of his full-time employment. (ECF Nos. 86 at 26; 99 at 18.) The restrictive covenant thus expired in 2019.

FHR was a client of EnvTech, but Rutherford did not begin to assist USAD with cleaning FHR's HF alkylation unit until 2020—after the non-competition clause expired. (ECF Nos. 71 at 21-22; 71-19 at 2, 4; 71-21 at 2-5.) And any assistance that Rutherford may have provided to PBF could not have violated the Employment Agreement's non-compete, as there is no evidence that EnvTech has ever worked with the PBF Energy Refinery in Torrance, California. Rutherford's Motion is granted as to his liability for

breaching the non-competition clause of the Employment Agreement.

### b.  Non-Disclosure Clauses of the Agreements

Both Agreements contain valid non-disclosure clauses. Under the Employment Agreement, Rutherford had a duty not to "directly or indirectly disclose confidential information," defined as "all records with respect to clients, business associates, customer or referral lists, contracting parties and referral sources of [EnvTech], and all personal, financial and business and proprietary information of [EnvTech] . . . obtained by [Rutherford] during the term of this Agreement and not generally known in the public." (ECF No 72-5 at 5.) The TSNCA similarly binds Rutherford to "not disclose any confidential information of [EnvTech] or any third party" without written authorization. (ECF No. 72-4 at 4.) Confidential information is defined in the TSNCA as "all information communicated to [Rutherford] with respect to the work conducted by or for" EnvTech and "all information, conclusions, recommendations, reports, advice, or other documents" Rutherford generated pursuant to his employment at EnvTech. (*Id.*)

EnvTech claims that Rutherford breached the Agreements by sharing and referencing EnvTech documents, sharing output from an EnvTech computer program, and disclosing EnvTech's proprietary chemical blends and pH neutral chelant cleaning process to USAD. (ECF No. 71 at 21-23.) The Court will address each allegation.

### i.  EnvTech Proposals and Other Documents

Rutherford sent Taylor EnvTech proposals, procedures, diagrams, flow paths, safety data sheets, and other files to assist USAD with cleaning HF alkylation units. (ECF No. 70-3 at 95-133, 157-207, 307-43 (sealed).) Each of these documents was generated by Rutherford or shared with Rutherford pursuant to his work with EnvTech, and EnvTech never authorized Rutherford to share them. (*Id.*; ECF Nos. 71 at 19; 71-4 at 26-27.) Rutherford himself testified that he obtained the 2015 Port Arthur Proposal and 2011 ConocoPhillips Quotation from his EnvTech computer, and that he did not consult with EnvTech before sending them to Taylor. (ECF No. 71-4 at 26.) Accordingly, Rutherford's distribution of these documents constitutes disclosure of confidential

information in violation of the TSNCA. (ECF No. 72-4 at 3-4.)

However, the parties dispute whether this information was "generally known in the public" and thus whether sharing it also violated the Employment Agreement. (ECF No. 72-5 at 5.) While proposals, procedures, and flow path diagrams are shared with and owned by refineries, it is unclear how closely those refineries guard this information. (ECF Nos. 71-4 at 42; 72 at 18; 99 at 5.) Nor is it clear the extent to which other documents Rutherford shared or referenced to assist USAD are readily accessible—or exactly which other documents Rutherford referenced while assisting USAD and what information from them he shared. (ECF No. 71-15 at 8.) Issues of material fact remain regarding whether Rutherford violated the Employment Agreement's non-disclosure clause by sharing EnvTech documents with USAD and whether Rutherford violated both Agreements by referencing EnvTech documents or running the "HF alky training orientation" at USAD. (ECF Nos. 71 at 25; 71-15 at 8; 71-17 at 6; 71-18 at 5.)

### ii.  EnvTech Chemical and Water Volume Calculations

Rutherford also sent USAD an EnvTech computer program's calculations of the chemical and water volumes and input costs for an HF alkylation unit cleaning. (ECF No. 71-4 at 37-38.) This EnvTech program and its output constitute information that was communicated to Rutherford with respect to his work at EnvTech. (ECF No. 72-4 at 3-4.) Accordingly, the program's estimated volumes and costs were confidential under the TSNCA and disclosing them to USAD violated its non-disclosure clause. (*Id.* at 4.) The program's output also constitutes confidential information under the Employment Agreement, as it is proprietary and/or financial information not generally known to the public that Rutherford obtained as part of his employment with EnvTech. (ECF No. 72-5 at 5.) Rutherford's disclosure of the EnvTech program's estimations thus violated the non-disclosure clauses of both Agreements.

### iii.  EnvTech Neutral Chelant Cleaning Process

EnvTech further alleges that Rutherford breached the non-disclosure clauses by teaching USAD employees EnvTech's proprietary neutral chelant cleaning formulas and

process. (ECF No. 71 at 21-22.) It is not obvious from the record whether the contents of EnvTech's proprietary chemical formulas—ETI 995, ETI 929, and ETI 987—were ever shared with Rutherford such that he could disclose their contents to USAD. (ECF Nos. 71-2 at 4; 71-3 at 6-7; 72-3 at 7; 86-3 at 6-7, 10; 91 at 91-92 (sealed); 99 at 20.) Nor is it clear exactly what information about EnvTech's formulas and process Rutherford shared with USAD. (ECF Nos. 71 at 25; 71-17 at 6; 71-18 at 5.) Genuine issues of material fact thus remain as to whether Rutherford violated the non-disclosure agreements by sharing EnvTech's proprietary formulas or process.

### 3.  Damage From Breach of Non-Disclosure Agreements

Finally, the evidence is not conclusive as to whether EnvTech was harmed by any breach Rutherford may have committed. Despite EnvTech's assertions to the contrary, it is not clear that they lost the PBF or FHR contracts due Rutherford's alleged breach. Employees of the refineries testified that they sought out other contractors due to scheduling issues with EnvTech. (ECF Nos. 71 at 27-28; 72 at 16; 74-1 at 3; 74-2 at 3.) But whether Rutherford's disclosures led the refineries to hire USAD—rather than waiting until EnvTech was available for a full-service cleaning or working with EnvTech in a more limited capacity—remains an issue of material fact. (ECF Nos. 71-2 at 5-6; 99-20 at 2-4; 99-25 at 4-5, 9-11.)

Although EnvTech's allegations of harm extend beyond a few lost contracts, the record does not clearly establish how USAD's entry into the HF alkylation unit cleaning market has impacted EnvTech's market share or profits. (ECF Nos. 71 at 27 (claiming EnvTech controlled 80-90% of pH neutral chelant HF alkylation unit cleaning worldwide before USAD entered the market, without stating their current market share); 99 at 22-23 (claiming EnvTech was formerly the only company with pH neutral HF alkylation unit cleaning capabilities).) The extent of Rutherford's contribution to USAD's ability to provide pH neutral HF alkylation unit cleanings is also unclear, especially given Taylor's alleged knowledge of EnvTech's proprietary chemical blends and process. (ECF No. 70-3 at 3-4 (sealed).) Because these issues of material fact remain, the parties' Motions

1    are denied as to the claims Rutherford breached the Agreements' non-disclosure

2    clauses.

3        **B.  Misappropriation of Trade Secrets Claim**

4            EnvTech further alleges that Rutherford's disclosures to Taylor and USAD

5    misappropriated its trade secrets. The elements of a misappropriation of trade secrets

6    claim under Nevada law are:

7            (1) a valuable trade secret; (2) misappropriation of the trade secret through use,

8            disclosure, or nondisclosure [or] use of the trade secret; and (3) the requirement

9            that the misappropriation be wrongful because it was made in breach of an

10           express or implied contract or by a party with a duty not to disclose.

11   *Kaldi v. Farmers Ins. Exch.*, 21 P.3d 16, 23 (Nev. 2001) (quoting *Frantz v. Johnson*, 999

12   P.2d 351, 358 (Nev. 2000)); *see also* NRS § 600A.030(2). The parties dispute each of

13   these elements.

14       **1.      Existence of Trade Secret**

15           Under Nevada's Uniform Trade Secrets Act ("UTSA"), a 'trade secret' is

16   "information"—including a formula, process, procedure, or system—that "derives

17   independent economic value, actual or potential, from not being generally known to, and

18   not being readily ascertainable by proper means by the public or any persons who can

19   obtain commercial or economic value from its disclosure or use." NRS §

20   600A.030(5)(a). This information must also be "the subject of efforts that are reasonable

21   under the circumstances to maintain its secrecy." *Id.*

22           EnvTech has clarified that its alleged trade secret is its two-step neutral pH

23   chelant cleaning process *plus* its specialized chemical blends.[4] (ECF Nos. 71 at 28-29;

24   86 at 14.) There is no doubt that the UTSA expressly covers the type of information

25

26           [4]Rutherford's repeated contentions that EnvTech employees have given
     conflicting descriptions of EnvTech's trade secret are inapposite. (ECF Nos. 72 at 18;
27   86 at 26-27.) Designating information a 'trade secret' is not a factor in determining
     whether it is actually a trade secret under Nevada law.

28

1  EnvTech seeks to protect here, and the economic value of the two-step process is

2  clear. (ECF No. 71 at 28-29 (describing time saved with two-step process).) *See also*

3  *V'Guara Inc. v. Dec*, 925 F.Supp.2d 1120, 1124 (D. Nev. 2013). The Court will analyze

4  only whether the alleged trade secret is generally known or readily ascertainable and

5  whether EnvTech took reasonable measures to protect it.

6  ### a.   Generally Known or Readily Ascertainable

7  A publicly available European patent names some of the chemicals that EnvTech

8  uses in its proprietary blend. (ECF Nos. 70-3 at 2 (sealed); 86-23 at 3; 88 at 25

9  (sealed).) But it refers to others generally and, more importantly, does not disclose the

10  ratios of each chemical or EnvTech's processes for applying them to HF alkylation units.

11  (ECF No. 88 at 25 (sealed).) Simply sharing an incomplete list of chemicals that they

12  use does not make the entirety of EnvTech's method for conducting pH neutral HF

13  alkylation unit cleanings readily accessible—just as knowing that a pastry contains flour,

14  eggs, butter, and sugar does not allow a baker to easily recreate it. The patent alone

15  does not destroy the trade secret. *See Elko, Inc. v. WTH Com. Servs., LLC*, No. 3:22-

16  CV-00015-MMD-CLB, 2023 WL 6141623, at *4 (D. Nev. Sept. 20, 2023) (citing *Nev.*

17  *Indep. v. Whitley*, 506 P.3d 1037, 1045 (Nev. 2022)) ("But even where aspects of

18  protected information are public, the information considered as a whole may

19  nevertheless be protected.").

20  Nor does a Dow Chemical Company patent from 1962 contain EnvTech's

21  formulas or process. (ECF Nos. 70-3 at 2-3 (sealed); 103-1.)[5] The Dow patent does list,

22  among many other possible chemicals, some of the chemicals and concentrations that

23  EnvTech uses. (ECF No. 103-1 at 2-3.) But because this list is both over- and

24  underinclusive and the patent does not reveal EnvTech's process, the Dow patent

25

26  [5]The Court takes judicial notice of the Dow patent (ECF No. 103-1), as an undisputed public record of the U.S. Patent and Trademark Office. FED. R. EVID. 201; *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n.1 (9th Cir. 2004) ("Under Federal Rule of Evidence 201, we may take judicial notice of the records of state agencies and other undisputed matters of public record.").

27

28

similarly cannot render EnvTech's formula or process readily ascertainable.

Several material factual questions still remain, including: (1) the extent to which Rutherford learned EnvTech's process when he observed a HF alkylation unit cleanings before he was hired and signed an NDA; (2) whether EnvTech procedures, which refineries are expected to share with subsequent cleaners, render EnvTech's process readily ascertainable; (3) whether a Halliburton patent contains EnvTech's formula or process; and (4) whether this information cumulatively renders EnvTech's formulas and process readily ascertainable. (ECF Nos. 70-3 at 2-3, 161-93, 327-28, 333-42 (sealed); 72 at 18; 86 at 16; 88 at 14-17 (sealed)[6]; 99 at 5, 21; 104 at 9, 14.)

### b.    Subject to Reasonable Efforts to Maintain Secrecy

EnvTech has taken several steps to protect its trade secrets. (ECF Nos. 71 at 29; 99 at 4-5.) Knowledge of the EnvTech chemical components and of how to plan, implement, and execute EnvTech's neutral pH chelant cleaning technique is limited to a select group of employees, all of whom must first sign an agreement to keep that information confidential. (ECF Nos. 71 at 29; 71-3 at 8, 10; 99 at 4 (claiming three employees know EnvTech's formulas).) EnvTech employees who do not know the neutral chelant cleaning chemical components or technique similarly must sign non-disclosure agreements before accessing any information concerning EnvTech processes and proposals. (ECF No. 71 at 29.) EnvTech emails and computers storing EnvTech information are password-protected, diagrams of refineries are often marked as proprietary, and EnvTech chemical formulas are not maintained in writing. (*Id.*; ECF Nos. 70-3 at 308-23 (sealed); 99 at 4-5; 102 at 7.) These efforts are more than sufficient to constitute reasonable means of protecting secrecy. *See Nev. Indep.*, 506 P.3d at 1044; *Finkel v. Cashman Pro., Inc.*, 270 P.3d 1259, 1264 (Nev. 2012) (noting that a company took "extreme measures" to protect information by giving four employees

---

[6]The Court cites to Bloch's testimony solely as an example of an unresolved factual issue. Because Bloch's testimony is not determinative, the Court will defer resolving whether he was properly disclosed as an expert.

access to it).

The fact that EnvTech is legally required to share some of its procedures with its client refineries does not negate this conclusion. (ECF No. 99 at 20.) *See* NRS § 600A.030(5)(a) (requiring only that a company undertake efforts that are "reasonable *under the circumstances*" (emphasis added)). It would be "fundamentally unfair" to conclude that EnvTech does not guard its trade secrets because it complies with "a mandate it is powerless to ignore." *Nev. Indep.*, 506 P.3d at 1044. EnvTech's trade secret—their pH neutral chelant cleaning chemical components and process—is thus subject to reasonable efforts to maintain its secrecy.

### 2.    Use or Disclosure of the Trade Secret

Once again, it is not obvious from the record whether the contents of EnvTech's proprietary chemical formulas were ever shared with Rutherford such that he could disclose their contents. (ECF Nos. 71-2 at 4; 71-3 at 6-7; 72-3 at 7; 86-3 at 6-7, 10; 99 at 20.) Moreover, there is little evidence as to exactly what information about EnvTech's HF alkylation unit cleaning process Rutherford shared with USAD during his HF alkylation unit training or at other times. (ECF Nos. 71 at 25; 71-15 at 8; 71-17 at 6; 71-18 at 5.) Genuine issues of material fact thus remain as to whether Rutherford shared EnvTech's proprietary formulas or processes.

### 3.    Breach of Duty Not to Disclose

Misappropriation of a trade secret is wrongful when someone discloses or uses a trade secret that they had reason to know was acquired under circumstances which gave rise to a duty to maintain its secrecy. *See* NRS § 600A.030(2)(c)(2)(ii); *see also Kaldi*, 21 P.3d at 23. Rutherford should have known that the Agreements' non-disclosure clauses barred him from sharing some of EnvTech's most closely guarded information: its chemical formulas and processes for pH neutral HF alkylation unit cleanings. (ECF Nos. 72-4 at 3-4; 72-5 at 5.) If Rutherford shared EnvTech's formulas or process, then he was in breach of his duty not to disclose this information under the Agreements.

1

2    **C. Evidentiary Objections**

3       **1. Stanco Declaration**

4    Rutherford argues that the Stanco declaration (ECF No. 71-2) is inadmissible

5 because Stanco does not have personal knowledge of whether Rutherford knew or

6 disclosed EnvTech's chemical formula, what information was shared with Rutherford at

7 the Humber Refinery cleaning, and how the EnvTech chemical formulas were

8 developed. (ECF No. 86 at 4-5.) Each of these challenges fails because Stanco is

9 presumed to have institutional knowledge as the president, and a long-time employee,

10 of EnvTech. (ECF No. 71-2 at 1-2.)

11    First, Stanco's assertion that Rutherford learned EnvTech's proprietary process

12 is based upon Rutherford's former position as the head of EnvTech's blending facility.

13 (ECF No. 71-2 at 3; 71-3 at 6.) As president of EnvTech, Stanco is presumed to have

14 personal knowledge of EnvTech's employees and their tasks. *See Self-Realization*

15 *Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1330 (9th Cir.

16 2000). If running the EnvTech blending facility requires knowing the chemical makeup of

17 EnvTech's proprietary formulas, then Stanco has sufficient personal knowledge that

18 Rutherford learned, or should have learned, EnvTech's proprietary formulas because

19 Rutherford formerly held that position.

20    Second, Stanco's declaration does not claim that Rutherford disclosed

21 EnvTech's formulas or process but rather states that Rutherford was *not authorized* to

22 disclose EnvTech's proprietary information to USAD. (ECF No. 71-2 at 5.)

23    Third, EnvTech's president can also be presumed to have personal knowledge of

24 his own company's business practices, including whether persons who are not EnvTech

25 employees may participate in the planning or execution of HF alkylation unit cleanings.

26 *See In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000); *Sheet Metal Workers' Int'l Ass'n*

27 *Loc. Union No. 359 v. Madison Indus., Inc. of Ariz.*, 84 F.3d 1186, 1193 (9th Cir. 1996).

28 Stanco's statement on whether Rutherford planned or executed the Humber Refinery

cleaning is thus supported by sufficient personal knowledge. (ECF No. 71-2 at 4.)

Finally, Stanco's statements on the development of EnvTech's formula and process in the 1990s are similarly based upon his institutional knowledge as EnvTech's president and employee of 25 years. *See Self-Realization Fellowship Church*, 206 F.3d at 1330 ("Personal knowledge can be inferred from an affiant's position."). The Stanco declaration is admissible in its entirety.

### 2. Straw Declaration

Rutherford challenges the admissibility of the Straw Declaration (ECF No. 99-29) on the grounds that Straw's statement that "EnvTech has never sold its proprietary chemicals to a refinery client for it to perform a cleaning and neutralization of an HF alky unit" manufactures a material dispute with Straw's prior deposition testimony. (ECF No. 102 at 4.) But Straw's declaration and deposition testimony are not inconsistent. In his deposition testimony, Straw admitted that EnvTech has sold chemicals to refineries to use "without [EnvTech] people there for simple jobs." (ECF No. 72-16 at 4.) It is obvious from the record that a full HF alkylation unit cleaning is not a simple job, and EnvTech has clarified that it only sold non-proprietary chemicals to refineries to clean small pieces of equipment not associated with HF alkylation units. (ECF No. 99 at 5.) As no factual dispute arises from Straw's statements, the Straw declaration is admissible.

### 3. Proper Authentication

Rutherford appears to rely on the standard set forth in *Orr v. Bank of America* in asserting that numerous exhibits filed by EnvTech (ECF Nos. 91 at 62-371, 436; 99-5; 99-10–99-20) have not been properly authenticated and thus cannot be considered at the summary judgment stage. (ECF No. 102 at 5.) *See also* 285 F.3d 764, 773 (9th Cir. 2002). Following the 2010 amendments to Federal Rule of Civil Procedure 56, the requirement that evidence submitted at summary judgment must be authenticated has been eliminated, and exhibits need only be capable of being "admissible in evidence at trial." *Romero v. Nev. Dep't of Corr.*, 673 Fed. Appx. 641, 644 (9th Cir. 2016) (quotation marks omitted); *accord* FED. R. CIV. P. 56(c)(4) & advisory comm. note to 2010 amends.

17

Having reviewed these records, the Court notes that their appearance, contents, substance, internal patterns, and other distinctive characteristics support the conclusion that they are what EnvTech claims them to be. FED. R. EVID. 901(b)(4). Many of the objected-to documents' alleged authors will also likely be witnesses at trial and can testify to their authenticity. *Id.* at (b)(1). Therefore, these documents appear capable of being authenticated such that they are admissible at trial, and the Court may consider them at this stage in the proceedings.

### 4. Bloch and McCord Deposition Testimony

EnvTech raised in their reply that the Bloch and McCord deposition excerpts filed under seal (ECF No. 88 (sealed)) are inadmissible because neither Bloch nor McCord was disclosed as an expert witness before the expert disclosure deadline on September 20, 2021. (ECF Nos. 39 at 3; 104 at 7-8.) The Court does not rely upon either deposition to make dispositive decisions in this case. Resolution of whether Bloch and McCord's depositions constitute properly disclosed expert testimony is thus deferred until the Court has heard argument from the party proffering their testimony.

## IV.   MOTIONS TO SEAL

In the Ninth Circuit, there is "a strong presumption in favor of access to court records." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). To overcome this presumption, a party must articulate "compelling reasons" justifying nondisclosure. *Kamakana v. City of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). One such compelling reason is use of the record to release trade secrets, *see id.*, or "business information that might harm a litigant's competitive standing," *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978). The instant parties seek to file under seal exhibits designated as confidential, which they contend contain proprietary and confidential information that could subject them to commercial disadvantage if it were made public. The Court addresses each of the four motions to seal below.

### A.   ECF No. 70

In this motion, EnvTech moves to seal its undisputed statement of facts along

18

with several attached exhibits, all of which contain, in some combination, descriptions of EnvTech and USAD's chemical blends, cleaning processes, proposals with customer contacts, and salary and pricing information. (ECF Nos. 70 at 3; 70-3 (sealed).) The Court will grant EnvTech's motion to seal because the statement of facts and attached exhibits contain commercially sensitive information that could disadvantage EnvTech or USAD if made public. (ECF No. 70-3 (sealed).) *See also Kamakana*, 447 F.3d at 1178.

### B. ECF No. 73

The Court will deny Rutherford's motion to seal six deposition transcripts. (ECF No. 73.) Rutherford fails to provide compelling reasons as to why the deposition excerpts must be sealed, considering the information within them is either inconsequential or already disclosed in Rutherford's briefing. (ECF Nos. 74-1 at 3; 74-2 at 3; 74-3 at 3-4; 74-4 at 3-4; 74-5 at 3; 74-6 at 3-4.) *See also Kamakana*, 447 F.3d at 1178; *Heath v. Tristar Prod., Inc.*, No. 2:17-cv-02869-GMN-PAL, 2019 WL 12311995, at *2 (D. Nev. Apr. 17, 2019) (holding that a stipulated protective order and the parties' designation of the depositions as confidential, alone, are insufficient grounds to seal a document).

### C. ECF No. 87

Rutherford also moves to seal the European patent and transcripts of the deposition testimony of Christopher Bloch and Richard Rutherford. (ECF No. 87.) There are no compelling reasons justifying the non-disclosure of the patent. *See Heath*, 2019 WL 12311995, at *2. Foreign patents are publicly accessible documents, and thus the information within them is "generally known to the public"—especially the relevant public in the chemical cleaning industry. *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1356 (Fed. Cir. 2009) (citing *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1379 (Fed.Cir.2006)). Sealing a patent that has already been publicly disclosed would do little to protect the information within it.

Rutherford's deposition transcript flushes out what he learned about EnvTech's process prior to his employment with them and how much information is divulged in

refinery processes and proposals. (ECF No. 88 at 31-36.) The Bloch transcript likewise contains sensitive business information, including the chemical components of EnvTech's proprietary formula, that may harm EnvTech if shared. (ECF No. 88 at 5-22.) *See also Nixon*, 435 U.S. at 598. The motion to seal is thus granted for the Bloch and Rutherford depositions and denied for the patent.

### D.  ECF No. 90

EnvTech moves to seal several exhibits already included in ECF No. 70-3, as well as more depositions and a list of EnvTech registered products. (ECF No. 90.) The duplicate documents from ECF No. 70-3 qualify for sealing for the same reasons stated earlier. (ECF No. 91 at 1-371.) Exhibits 12 through 17 contain detailed information about EnvTech's formula and process, which justifies their nondisclosure as commercially sensitive information. (*Id.* at 373-436.) *See also Kamakana*, 447 F.3d at 1178. The Court therefore grants EnvTech's motion to seal.

## V.  CONCLUSION

The Court notes that the parties made several arguments and cited several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motions.

It is therefore ordered that Plaintiff's motion for summary judgment (ECF No. 71) is denied.

It is further ordered that Defendant's motion for summary judgment (ECF No. 72) is granted as his liability for breaching the non-competition agreements but is otherwise denied.

It is further ordered that Plaintiff's motions to seal (ECF Nos. 70, 90) are granted.

It is further ordered that Defendant's first motion to seal (ECF No. 73) is denied.

It is further ordered that Defendant's second motion to seal (ECF No. 87) is granted as to the Bloch and Rutherford depositions and denied as to the patent. Defendant is directed to file a copy of the patent within 5 days.

DATED THIS 18th Day of December 2023.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE